UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| AMERICAN CONTRACTORS INDEMNITY COMPANY<br><br>v.<br><br>GALAFORO CONSTRUCTION, LLC and PAUL M. GALAFORO, JR. | CIVIL ACTION NO. 20-2860<br><br>DISTRICT JUDGE AFRICK<br><br>MAGISTRATE JUDGE ROBY |

**FIRST SUPPLEMENTAL AND RESTATED COMPLAINT**

American Contractors Indemnity Company ("ACIC"), for its First Supplemental and Restated Complaint against Galaforo Construction, LLC and Paul M. Galaforo, Jr. avers as follows:

1.

Plaintiff, ACIC, is a corporation incorporated under the laws of the State of California with its principal place of business in California.

2.

Defendants herein are:

a. Galaforo Construction, LLC ("Galaforo Construction"), a Louisiana Limited Liability Company with its principal place of business in Jefferson Parish, Louisiana and whose members, upon information and belief, are residents of Jefferson Parish, Louisiana; and

b. Paul M. Galaforo, Jr. ("Paul Galaforo"), a person of the full age of majority and a citizen and resident of Jefferson Parish, Louisiana.

(Galaforo Construction and Paul Galaforo are hereinafter sometimes collectively referred to as the "Indemnitors.")

## JURISDICTION AND VENUE

3.

There is complete diversity of citizenship between plaintiff and defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Accordingly, this Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332.

4.

Venue is proper herein pursuant to 28 U.S.C. § 1391(b)(1) as all defendants are domiciled within the Eastern District of Louisiana.

## BACKGROUND

5.

In order to induce ACIC to issue surety bonds for Galaforo Construction, on or about January 22, 2018, Galaforo Construction, as principal and indemnitor, and Paul Galaforo, as indemnitor, each executed a General Indemnity Agreement (the "Indemnity Agreement") in favor of ACIC whereby they agreed, *inter alia*:

**III. INDEMNITY, EXONERSATION AND HOLD HARMLESS**

The Principals and Indemnitors shall, jointly and severally, exonerate, indemnify, reimburse, and save and hold the Surety harmless from and against any and all demands, liabilities, losses, costs, damages, expenses and fees (including, but not limited to those incurred by or in connection with accountants, attorneys, consultants, engineers, investigation, and other professionals), interest, court costs, and any and all other types of losses, costs or expenses of whatsoever kind or nature, which the Surety may sustain or incur or which arise by reason of or in any manner in consequence of any one or more of the following: (i) the execution or procurement by the Surety of any Bond; (ii) the failure of any Principal or Indemnitor to perform or comply with any provision of this Agreement; (iii) the enforcement of any provision of this Agreement; (iv) the conduct of any investigation regarding the Surety's alleged obligations or liabilities under any Bond or in connection with any Contract; (v) any attempt by or on behalf of the Surety to obtain a release or reduction of the Surety's liability or alleged liability under any Bond or Contract; (vi) any attempt by or on behalf of the Surety to recover any unpaid premium in connection with any Bond; (vii) the

prosecution or defense of any action or claim in connection with any Bond or Contract; (viii) the loan or advance of any monies to any Principal or Indemnitor; or (ix) the Surety's attempt to determine, discharge or mitigate its loss or exposure to loss in connection with any Bond or Contract, or to enforce any of its rights pursuant to this Agreement, by suit or otherwise. The obligations provided for in this paragraph are without regard to whether the Surety, in its sole and absolute discretion, elects to employ its own counsel or, in lieu thereof or in addition thereto, permits or requires any Principal and/or Indemnitor to make arrangements for or assist in the Surety's legal representation and protection.

The Principals and Indemnitors further agree that they shall be liable for, and that the Surety shall be entitled to charge and recover for, any and all payments made by the Surety in the good faith belief that: (1) any Principal or Indemnitor is or has been in default under this Agreement; (2) the Surety was or might be liable for a claim asserted against a Bond, whether or not such liability actually existed; or (3) such payments were or are necessary or expedient to protect any of the Surety's rights or interests or to avoid or lessen the Surety's actual or alleged liability. The Surety shall be entitled to the rights and remedies set forth in this Section III and to all of the benefits of this Agreement with respect to any liability, payment, loss or cost that is incurred or made by the Surety in good faith. The foregoing obligations shall extend to and include an obligation to pay to the Surety interest on any payments made by the Surety as a result of having issued any Bond, at the rate of ten percent (10%) per annum or the maximum rate allowed by law, whichever is lower, calculated from the date such payment is made by the Surety.

**[…]**

**VIII. SETTLEMENTS**

The Surety shall have the right, in its sole and absolute discretion, to adjust, settle, prosecute, defend, compromise, litigate, protest, or appeal any claim, demand, suit, award, assessment or judgment on or in connection with any Bond, Bonded Contract, or Contract. If, however, any Principal or Indemnitor desires that the Surety consider adjusting, settling, prosecuting, defending, compromising, litigating, protesting, or appealing, any claim, demand, suit, award, assessment, or judgment against any Principal or the Surety, such Principal or Indemnitor shall:

A. Give written notice to the Surety to this effect by certified or registered mail; and

B. Simultaneously therewith, deposit with the Surety cash, securities or other collateral, in form and amount acceptable to the Surety in its sole and absolute discretion, to completely cover the Surety's exposure or perceived exposure to any loss, cost or expense for which the Surety is entitled to exoneration, indemnification or reimbursement pursuant to this Agreement. The Surety shall be entitled to utilize counsel of its own choice in prosecuting, defending, resisting, litigating or appealing any such claim, demand, suit, award or judgment, or in appealing from any judgment, award or assessment, whether or not any Principal

or Indemnitor also provides its own counsel, and all associated costs and expenses shall be recoverable by the Surety pursuant to this Agreement.

Performance of both sub-Section A and B of this Section VIII shall be an absolute condition precedent to the right of a Principal or Indemnitor to challenge the Surety's good faith with respect to settlement of any claims asserted against the Surety. Performance of both sub-Sections A and B of this Section IX shall not, however, in any way diminish the right of the Surety to compromise, settle, pay, or otherwise discharge any claim, demand, suit, award or judgment in its sole and absolute discretion, subject only to its obligation of good faith as provided herein.

**IX. REIMBURSEMENT**
In the event of any payment by the Surety, an itemized, sworn statement of the amount of any such payment, invoice(s) or other evidence of such payment shall be prima facie evidence of the fact and the amount of such payment and, in the absence of actual fraud, shall be final, conclusive and binding upon any Principal or Indemnitor in any claim, suit or other proceeding by the Surety.

[…]

ACIC attached hereto as **Exhibit "A"** copy of the Indemnity Agreement and incorporates it herein as if written out *in extenso*.

## New Port Sulphur Public Library Bonds

6.

Plaquemines Parish Government ("PPG"), as owner, entered into a contract ("the Port Sulphur Library Contract") with Galaforo Construction, as contractor, for the construction of the New Port Sulphur Public Library project (the "Port Sulphur Library Project").

7.

Upon application of Galaforo Construction and in consideration of and in reliance on the Indemnity Agreement, ACIC, as surety, issued a payment bond (the "Port Sulphur Library Payment Bond") and performance bond (the "Port Sulphur Library Performance Bond") (the Port Sulphur Library Payment Bond and the Port Sulphur Library Performance Bond are hereinafter sometimes collectively the "Port Sulphur Library Bonds") with PPG as obligee and Galaforo Construction as

principal for Port Sulphur Library Contract. The Port Sulphur Library Payment Bonds had a penal sum of Three Million One Hundred Thirteen Thousand and 00/100 Dollars ($3,113,000.00).

8.

After construction began, issues arose between Galaforo Construction and PPG regarding Galaforo Construction's performance on the Port Sulphur Library Project.

9.

By letter of June 7, 2019 from PPG to Galaforo Construction and ACIC, PPG informed Galaforo Construction that it was in material breach of its obligations under the Port Sulphur Library Contract and made demand upon ACIC to "perform its obligations under the bonds."

10.

By letter of June 19, 2019, from PPG to Galaforo Construction and ACIC, PPG formally placed Galaforo Construction in default and terminated the Port Sulphur Library Contract as a result of Galaforo Construction's failure to "complete the work in a timely manner, according to the terms of the Agreement," and again made demand on ACIC to "perform its obligations under the bonds."

11.

In addition to PPG's demand on ACIC to perform its obligations under the Port Sulphur Library Performance Bond, PPG also asserted claims against ACIC for liquidated damages for delays in construction and increased engineering costs and fees.

12.

ACIC retained Colby Consulting, Inc. ("Colby Consulting") to investigate the Port Sulphur Library Project and the claims asserted against the Port Sulphur Library Bonds, and to obtain bids for the performance of the work pursuant to the Port Sulphur Library Contract (the "Port Sulphur Library Work").

13.

An accounting of the contract funds through the time of Galaforo Construction's termination revealed that there was a remaining contract balance of $2,342,076.05 on the Port Sulphur Library Contract.

14.

ACIC, through Colby Consulting, received a bid for the performance of the Port Sulphur Library Work from CDW Services, LLC ("CDW") for the price of $3,918,000.00.

15.

Thereafter, ACIC entered into a Tender, Compromise, and Settlement Agreement with PPG whereby ACIC tendered CDW as the completion contractor to complete the Port Sulphur Library Work and paid to PPG $1,636,923.95 in settlement of all claims, disputes and obligations between PPG and ACIC arising out of the Port Sulphur Library Contract, the Port Sulphur Library Project, and the Port Sulphur Library Performance Bond.

16.

In addition to the performance claims asserted by PPG against ACIC, payment claims were asserted against the Port Sulphur Library Payment Bond as a result of Galaforo Construction's failure to pay certain of its subcontractors and/or suppliers.

17.

As a result of the claims asserted against the Port Sulphur Library Payment Bond, to date, ACIC has paid to Galaforo Construction's subcontractors and suppliers the following:

| Subcontractor/Supplier | Amount |
|---|---|
| Bernard Brothers | $ 31,250.00 |
| National Polyfab | $ 55,649.64 |
| Carlo Ditta | $ 42,252.31 |
| Elliot Electric Supply | $ 4,314.62 |
| Patriot Equipment Rental | $ 39,969.28 |

| | |
|---|---:|
| Beta Group | $ 6,571.27 |
| Midgulf Forest | $ 1,911.00 |
| Throne to Go | $ 2,509.47 |
| New Orleans Iron Works | $ 127,522.40 |
| Orleans Sheet Metal Works | $ 3,465.00 |
| West Plumbing | $ 6,410.00 |
| Silicone Specialties | $ 453.04 |
| Corass Electrical | $ 13,012.55 |
| Ram Tool | $ 5,046.52 |
| BECC | $ 7,715.40 |
| Harcon | $ 216,738.72 |
| Coastal Fire | $ 13,419.00 |
| Air Bags LLC | $ 1,500.00 |
| New Orleans Glass | $ 54,490.04 |
| T&N Reinforcing | $ 4,300.00 |
| Advanced Architectural | $ 8,084.00 |
| Powerhouse Electric | $ 6,687.50 |
| Gator Masonry | $ 4,222.13 |
| **TOTAL** | **$ 657,493.89** |

18.

Additionally, during the course of the investigation of the claims asserted, ACIC incurred costs and consulting fees and made payments to Colby Consulting totaling $22,686.31.

19.

As a result of the foregoing, ACIC retained the law firm of Simon, Peragine, Smith & Redfearn, LLP ("SPSR") to represent ACIC with regard to the claims asserted against the Port Sulphur Library Bonds and with regard to the enforcement of ACIC's rights against the Indemnitors pursuant to the Indemnity Agreement. As a result, ACIC has incurred attorneys' fees and costs to SPSR totaling $76,873.44, to date.

20.

ACIC incurred additional expenses with regard to the claims asserted against the Port Sulphur Library Bonds totaling $733.07.

21.

To date, ACIC has incurred losses, attorneys' fees, investigative and adjustment costs as a result of the claims asserted against the Port Sulphur Library Bonds resulting in a net loss of $2,394,710.66.

## Louis Marrero Park Improvements Bonds

22.

The City of Westwego ("Westwego"), as owner, entered into a contract (the "Louis Marrero Contract") with Galaforo Construction, as contractor, for the construction of a project entitled "Louis Marrero Park Improvements" (the "Louis Marrero Project").

23.

Upon application of Galaforo Construction and in consideration of and in reliance on the Indemnity Agreement, ACIC, as surety, issued a statutory payment bond (the "Louis Marrero Payment Bond") and performance bond (the "Louis Marrero Performance Bond") (the Louis Marrero Payment Bond and the Louis Marrero Performance Bond are sometimes hereinafter jointly referred to as the "Louis Marrero Bonds") for the Louis Marrero Contract with Westwego as obligee and Galaforo Construction as principal. The Louis Marrero Bonds had a penal sum of Five Hundred Fifty Four Thousand and 00/100 Dollars ($554,000.00).

24.

After construction began, issues arose between Galaforo Construction and Westwego regarding Galaforo Construction's performance on the Louis Marrero Project.

25.

By letter of June 6, 2019, Westwego wrote to Galaforo Construction to provide formal notice of default and termination of the Louis Marrero Contract as a result of Galaforo Constructions' alleged

"failure to complete the Project in accordance with the Contract and failure to make payments to Subcontractors […]."

26.

By separate letter of June 6, 2019, Westwego wrote to ACIC to provide formal notice of default and termination of the Louis Marrero Contract and to make demand on ACIC "to take action pursuant to Section 5 of the Performance Bond."

27.

In addition to Westwego's demand on ACIC to perform its obligations under the Louis Marrero Performance Bond, Westwego also asserted claims against ACIC for liquidated damages, increased engineering costs and fees, and for the correction of various alleged deficiencies in the work performed by Galaforo Construction.

28.

ACIC retained Colby Consulting to investigate the Louis Marrero Project and the claims asserted against the Louis Marrero Bonds, and to obtain bids for the performance of the work pursuant to the Louis Marrero Contract (the "Louis Marrero Work").

29.

An accounting of the contract funds through the time of Galaforo Construction's termination revealed that there was a remaining contract balance of $121,442.35 on the Louis Marrero Contract.

30.

ACIC, through Colby Consulting, received a bid for the performance of the Work from VPG Construction ("VPG") for the price of $312,853.74.

31.

Thereafter, ACIC entered into a takeover agreement with Westwego (the "Louis Marrero Takeover Agreement") whereby ACIC agreed to arrange for the performance of the Work on the Louis Marrero Project.

32.

On or about November 6, 2019, ACIC entered into a completion contract with VPG (the "Louis Marrero Completion Contract") whereby VPG agreed to perform the work which ACIC agreed to arrange to be performed under the Louis Marrero Takeover Agreement for the price of $312,853.74.

33.

Thereafter, the Louis Marrero Completion Contract was increased by change orders in the amount of $7,926.36 to $320,780.10.

34.

For its work under the Louis Marrero Completion Contract, to date, ACIC has paid to VPG $317,580.10.

35.

Following completion of the Louis Marrero Work, ACIC entered into a settlement agreement with Westwego (the "Westwego Settlement Agreement") resolving all disputes and obligations between Westwego and ACIC arising out of the Westwego Contract, the Westwego Project, the Westwego Bonds, and the Westwego Takeover Agreement. Pursuant to the settlement agreement, ACIC paid $105,000.00 to Westwego and Westwego paid $25,942.35 to ACIC.

36.

In addition to the performance claims asserted against the Louis Marrero Performance Bond, payment claims were asserted against the Louis Marrero Payment Bond as a result of Galaforo Construction's failure to pay certain of its subcontractors and/or suppliers.

37.

As of this date, ACIC has paid to Galaforo Construction's subcontractors and suppliers the following:

| Subcontractor/Supplier | Amount |
|---|---|
| Southern Components | $ 6,697.13 |
| Bernard Brothers | $ 6,410.00 |
| Carlo Ditta | $ 3,338.52 |
| National Polyfab | $ 2,184.98 |
| Safeguard Services | $ 5,600.00 |
| All Rite Doors & Hardware | $ 26,029.26 |
| JMA Flooring | $ 9,000.00 |
| Throne to Go | $ 1,915.86 |
| Amko Fence | $ 9,027.00 |
| Perque Carpet & Drapery | $ 15,000.00 |
| Orleans Sheet Metal Works | $ 86,470.00 |
| Priority Plumbing | $ 22,850.00 |
| Red Hawk | $ 14,027.50 |
| Corass Electrical | $ 14,830.19 |
| Ram Tool | $ 311.22 |
| **TOTAL** | **$ 223,691.66** |

38.

During the course of the investigation of the claims asserted, ACIC incurred costs and consulting fees and made payments to Colby Consulting totaling $7,425.50.

39.

As a result of the foregoing, ACIC retained the law firm of SPSR to represent ACIC with regard to the claims asserted against the Louis Marrero Bonds and the enforcement of ACIC's rights

against the Indemnitors pursuant to the Indemnity Agreement. As a result, ACIC has incurred attorneys' fees and costs to SPSR totaling $104,437.48, to date.

40.

ACIC incurred additional expenses with regard to the claims asserted against the Louis Marrero Bonds totaling $657.74.

41.

To date, ACIC has incurred losses, attorneys' fees, investigative and adjustment costs as a result of the claims asserted against the Louis Marrero Bonds resulting in a net loss of $732,850.13.

42.

Thus, as a result of the claims asserted against both the Port Sulphur Library Bonds and the Louis Marrero Bonds, ACIC has incurred losses, attorneys' fees, investigative and adjustment costs resulting in a net loss of $3,127,560.79.

43.

The Indemnitors have failed to indemnify, collateralize or save ACIC harmless for these losses and are therefore in breach of the Indemnity Agreement.

WHEREFORE, after due proceedings herein, ACIC prays for judgment in its favor and against Galaforo Construction and Paul Galaforo, *in solido*, in the full sum of $3,127,560.79, plus all additional losses, attorneys' fees, costs and expenses incurred as a result of the claims asserted against ACIC, interest from the date payments were made by ACIC, all costs of these proceedings, and all other general and equitable relief.

**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

Respectfully submitted,

/s/ Kaile L. Mercuri
H. Bruce Shreves (La. Bar. 12040)
Jay H. Kern (La. Bar. 07345) (TA)
Kaile L. Mercuri (La. Bar 35203)
SIMON, PERAGINE, SMITH & REDFEARN, LLP
1100 Poydras Street, 30th Floor
New Orleans, LA 70163
Telephone: (504) 569-2030
Facsimile: (504) 569-2999
Email: bruces@spsr-law.com
Email: jayk@spsr-law.com
Email: kailem@spsr-law.com

**Attorneys for American Contractors Indemnity Company**

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing pleading has been electronically filed with the Clerk of Court for the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing to the appearing parties.

New Orleans, Louisiana this 20th day of October 2021.

/s/ Kaile L. Mercuri